[Cite as *Petit v. Petit*, 2013-Ohio-4860.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

NICOLE PETIT NKA NIEMEYER,

    PLAINTIFF-APPELLEE,              CASE NO.  10-13-01

    v.

MICHAEL J. PETIT,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Mercer County Common Pleas Court
Domestic Relations Division
Trial Court No. 09-DIV-066

Judgment Reversed and Cause Remanded

Date of Decision:   November 4, 2013

APPEARANCES:

    *Kelly J. Rauch* **for Appellant**

    *Thomas E. Luth*  **for Appellee**

Case No. 10-13-01

**WILLAMOWSKI, J.**

{¶1} Defendant-Appellant Michael J. Petit ("Michael") brings this appeal from the judgment of the Court of Common Pleas of Mercer County, Domestic Relations Division, reducing Michael's visitation after Michael sought to alter the days of his visitation. For the reasons set forth below, the judgment of the trial court is reversed and remanded for further proceedings.

{¶2} Michael and Plaintiff-Appellee Nicole C. Petit aka Niemeyer ("Nicole") were married on April 1, 2006. Doc. 3. During the marriage, Michael and Nicole had two children: Marcus, born in 2006, and Jonathan, born in 2009. *Id*. On December 2, 2009, Nicole filed a complaint for divorce. *Id*. The divorce was granted on August 22, 2011. Doc. 140. The divorce decree granted Michael parenting time on Tuesdays and Thursdays from noon until 8:00 p.m. and alternating weekends from Friday at 7:00 p.m. until Sunday at 7:00 p.m., subject to Nicole being permitted to take the children to church every Sunday. *Id.*

{¶3} On October 11, 2011, Michael filed a motion to modify visitation so that his visits with Marcus and Jonathan would be on the same weekend as his visits with the boys' half-siblings. Doc. 149. Michael also requested that Nicole no longer be permitted to take the children to church on his weekends as it interfered with his parenting time. *Id.* On October 27, 2011, Nicole filed her motion to modify Michael's parenting time to that of local rule schedule only and

requested that it be with supervision. Doc. 153. Nicole also requested that a Guardian Ad Litem be appointed. Doc. 154. The trial court appointed Daniel Myers ("Myers") as the Guardian Ad Litem on October 31, 2011. Doc. 158. On January 12, 2012, Nicole filed a second motion to modify Michael's visitation and requested that it be restricted to every other Saturday only and with supervision. Doc. 171. Nicole based this motion on an allegation that Michael did not properly clothe the children for the weather and did not provide proper nutrition or general care. Doc. 172. Michael filed a response to Nicole's motion denying any neglect of the children on July 25, 2012. Doc. 173.

{¶4} A hearing on the motions was held on April 30, 2012. The first witness was Roberta Donovan ("Donovan"). Donovan is a social worker for Foundations Behavioral Health Services and provides counseling for Marcus. Tr. 8-10. Donovan testified that she sees Marcus on an outpatient basis two to three times a month. Tr. 10. Counseling was initiated by Nicole. Tr. 11. Donovan described Marcus as follows.

> **Marcus is a very strong-willed individual/child, has some difficulties with boundaries, truly does not like the word no. When he comes in is very driven by wanting a reward for doing well, whether he does well or not. It's always about the end result of wanting a reward.**
>
> **\* \* \***
>
> **Marcus is a child, and since he has been diagnosed with attention deficit hyperactivity disorder ["ADHD"], is going to**

**benefit from a consistent home life, whether it be with Nicole or Michael or at school, consistency is the most important thing for him and having structure.**

Tr. 11-12. In addition, Donovan testified that Marcus will say whatever will please the parent who is present. Tr. 14.

**\* \* \* Michael shared how he had not attended conferences as he has not been told when they were, kind of gave a history about when him and, when Nicole and Michael had split up at this time, kind of what his diagnosis was. During the session, Marcus was very clear on stating how he hates his mom. Also, at that time Marcus was making comments of people being killed and how people in treatment are a bunch of killers.**

**Q. Did the child ever respond in similar fashion when he was with his mother?**

**A. Yes. He will say similar things, but referring them to his father.**

Tr. 13-14. Donovan testified that through her contact with Marcus through Head Start, there are more behavioral difficulties on Tuesday and Thursday, the days that Marcus goes to Michael's home. Tr. 15.

{¶5} On cross-examination, Donovan testified that although the case had previously been closed, Nicole reopened it on November 2, 2011. Tr. 16. The case was reopened after Marcus scratched his face while having a tantrum at Head Start. Tr. 17. Marcus was hospitalized for a mental disorder at that time and placed on medication for his ADHD. Tr. 17. Marcus was admitted to the hospital on October 27, 2011, and released on October 31, 2011. Tr. 17. The original case

was opened on March 10, 2010, and continued until May 16, 2011. Tr. 18. Donovan also testified that Marcus has issues transitioning from one house to the other and that there are issues when Marcus returns from Michael's house to Nicole's house. Tr. 22. Donovan also testified that her agency had been trying to set up a home visit so that they could observe Marcus in his own environment, but Nicole had not been cooperative in doing so. Tr. 23-24. Although Michael has only been to one session, Nicole schedules them and Donovan did not know if Michael was informed of the times. Tr. 25-26. Donovan also testified that it is not the movement from one home to the other, but the inconsistency between Nicole and Michael's parenting styles that is disruptive for Marcus. Tr. 26-27.

{¶6} The next witness was Michelle Self ("Self"). Self is the director of early childhood services at Mercer County Head Start. Tr. 32. Marcus is a student in the Head Start Program. Tr. 33. During the two years that Marcus has attended Head Start, Self has been concerned about his social and emotional needs and how they have affected his education. Tr. 33.

> **\* \* \* Marcus is very often not able to be in a group situation without there being issues. Whether the issue is him being in another child's personal space or not being able to control his behavior as far as making the right choices with different things, with toys, with equipment there, outside/inside.**
>
> **He very much has a lot of issue with harming himself. He will very often, especially when his feelings, when his emotions rise, he will often scratch himself, hit his head on the floor, that kind of thing. So we're seeing the behaviors that concern me. What**

**I'm seeing are noncompliance but also him dealing with his emotions.**

Tr. 34. Self testified that Marcus has more issues on Tuesday and appears anxious about going to Michael's home. Tr. 35. After Marcus was hospitalized and medicated, his behavior improved. Tr. 42. Self testified that she did not have an opinion on the visitation schedule, but that both Michael and Nicole needed to be consistent in how they parented Marcus. Tr. 44. Although Self testified that Michael was not involved with the program, she testified on cross-examination that the program only contacts the parent who enrolls the child, which would be Nicole. Tr. 44-45. When there are issues with Marcus at the school, they attempt to contact Nicole first and then follow the contact sheet which Nicole completed, which listed Nicole's mother as the second contact person. Tr. 46. Michael does not receive notices from the school and the teachers do not send home behavioral information. Tr. 48-49. Self also testified that Marcus is a very bright boy, but is also manipulative of the people around him, including his parents. Tr. 51.

{¶7} The third witness was Lorna Niemeyer ("Niemeyer"), who is Nicole's mother. Tr. 56. Niemeyer testified that she observes Michael with Marcus and Jonathon when they pick the kids up for church or when Michael picks them up from her home. Tr. 58. Niemeyer testified that Nicole has a strict routine that the children follow, while she does not believe that Michael has the same routine. Tr. 59. She does not think that Marcus obeys Michael. Tr. 59. When she picks up

the boys on Sunday mornings, they are frequently in the same clothes they wore when the left on Friday and she always bathes them before taking them to church. Tr. 60-61.

{¶8} Nicole was the next witness. Nicole testified that she would prefer that Michael have no visitation during the week and only supervised visitation every other weekend. Tr. 68. Nicole wants the children to be asleep by 8:00 p.m. and picking them up at 8:00 p.m. during the week does not allow that to happen. Tr. 69-70. In addition, Nicole believes that Michael goes out of his way to make the boys "worse before they come back" by giving them candy and kool-aid in the evening. Tr. 70. She testified that she did not want to have the caseworker coming to her home and that she has tried to avoid it. Tr. 70-71. When asked whether she had asked Michael to help her get Marcus to the various appointments, she testified that she had discussed the issue with the GAL during the divorce proceedings. Tr. 71. When there are discussions about parenting issues, Nicole testified that she wants Michael to do things her way and when he told her it does not work for him, she told him it "sounds like a parenting problem" and "decided to abruptly end the conversation". Tr. 72. In February of 2011, Nicole went to Michael's home to pick up the children. Tr. 72. When no one answered the door, she called the police, who eventually were able to wake Michael and the children. Tr. 72-73. At the time, Jonathan had a black eye and

Michael had no idea how it happened. Tr. 73. On one instance, Nicole sent the children to Michael's home with fevers and asked Michael to take them to the doctor, but he chose not to do so. Tr. 75. Nicole testified there were multiple instances where Michael did not give the children the medication prescribed to them by the doctor. Tr. 75-76. In October of 2011, Nicole picked up the children on Sunday morning and in her opinion, they were filthy. Tr. 77. She testified that Jonathan had four gashes in his head and that Michael said he had fallen off of the bed. Tr. 77. Nicole took Jonathan to the police who photographed the injury. Tr. 77. Michael told the officer who questioned him that Jonathan had fallen off his tricycle and off the bed, so there were two separate incidents. Tr. 80. When Marcus was admitted to the hospital, Michael did not come to the hospital. Tr. 81. Nicole testified that she withdrew Marcus from counseling when medication was recommended. Tr. 82. She decided to put herself into counseling to become a better parent rather than medicating her child. Tr. 81. Her counselor was her pastor who has "had a child like [Marcus]" and is "writing a book on raising a child like this." Tr. 82. When Marcus comes home from Michael's home, he is difficult because the routines are different. Tr. 85-86. Nicole testified that during the weekdays, she would like Michael to feed the children, bathe the children, and have them ready for her to pick up at 6:00 p.m. rather than the scheduled 8:00 p.m.

Once Marcus starts kindergarten, Nicole would like Michael to also make sure the homework is completed on his evening. Tr. 88.

{¶9} On cross-examination, Nicole admitted that she started the counseling soon after the divorce was filed and ended it soon after the decree was entered. Tr. 90. The motion to modify the parenting schedule was filed in October of 2011, and Marcus was returned to counseling soon after the motion was filed. Tr. 90. Although the counselors recommended a psychiatric evaluation for Marcus in June of 2011, Nicole did not agree to it until after Marcus was hospitalized in October of 2011. Tr. 91. She did not want to do the evaluation because she did not want to have Marcus medicated. Tr. 91. Nicole also admitted that she had told Michael she did not want to alter the visitation schedule because she wanted her children on the same schedule as her friend's children. Tr. 92. Nicole testified that while she was taking Marcus to the hospital in Toledo, Michael asked to have Jonathan so that he could take him trick or treating, but she would not let him. Tr. 93. As to Marcus' schooling, Nicole admits that she does not provide Michael with information. Tr. 94. She also admitted that the police did not press charges concerning the injuries to Jonathan in 2011. Tr. 95. Nicole also admitted that she schedules Marcus' counseling sessions for her day and does not notify Michael of the appointments. Tr. 95-96. When Marcus was removed from school, Nicole did

contact Michael and Michael did come to the home to meet with the caseworker. Tr. 98.

{¶10} When questioned by the Guardian Ad Litem, Myers, Nicole testified that the caseworker had come to her house, met with Marcus alone, then met with Marcus and Michael. Tr. 99. Michael then left with both boys and the caseworker stayed to speak with her. Tr. 99-100. Nicole testified that if the counselor wanted a joint session with her and Michael, she would do it. Tr. 100. She also testified that she would like any midweek visitations to begin around 4:00 p.m. and end at 6:00 p.m. Tr. 100.

{¶11} After Nicole finished presenting her case, Michael presented his case, and was his first witness. Michael first was asked why his hair was red and testified that as a bonding activity with his seventeen-year-old daughter, he let her dye his hair and she chose to color it red. Tr. 103. In addition to Marcus and Jonathan, Michael has three other children from a prior marriage: Katherine who was 17, Mandy who was 13, and Lukas who was 11. Tr. 103. Michael testified that he sees these children every other weekend and extended time during the summer. Tr. 103. Michael testified that he was moving from the two bedroom apartment to a larger house that he had purchased. Tr. 104. The new home had four bedrooms with a possible fifth. Tr. 105. Michael testified that each child would have his or her own bed, with Marcus and Jonathan initially sharing a room

with a bunk bed in it. Tr. 107-108. Michael testified that Nicole had "reservations" about all the kids being at visitation on the same weekend. Tr. 109. Nicole also told him that she wanted her schedule to match that of her friend. Tr. 109. Michael would like the visits to be on the same weekends so that the children can spend time with their siblings. Tr. 110. When it is Michael's visit, Nicole does not usually send any clothes for the children as they do not have a bag. Tr. 111. Nicole did provide some diapers for Jonathan. Tr. 111. Michael testified that he has asked Nicole via text messages to send additional clothing for the boys, but she usually does not do so, even for the weekend visits. Tr. 112. Michael also testified that he would like to alter the visitation schedule so that Nicole does not pick the boys up for church on his Sundays because it takes half a day away from his visits. Tr. 112. As to Jonathan's injuries, Michael testified it happened because the boys were jumping on the bed and Jonathan fell, hitting his head on some items on the floor. Tr. 114. Then, the next day Jonathan tipped his tricycle and struck his head again. Tr. 114. The police investigated and sent the report to Children's Services, who chose not to investigate because the injuries did not appear to be caused by anything other than typical child behavior. Tr. 114-15. As to the incident when Nicole called the police because he did not answer the door, Michael testified that he and the boys were asleep taking naps and did not hear her knocking. Tr. 115. Michael testified that Nicole has not asked him to take Marcus

to any appointments and does not tell him when they are scheduled. Tr. 116. Michael also testified that he was not notified concerning the issues at Head Start prior to the last incident, which occurred soon before the hearing. Tr. 117. Michael testified that generally, Marcus behaves properly when with him, except for a lack of focus. Tr. 118-19. Michael also testified that for discipline, he counts and if the boys are not behaving when he reaches three, he places them in timeout. Tr. 119-20. Michael denied that he gave the children a lot of sugar so that they would act up for Nicole. Tr. 121. At his home, bedtime for the children starts at 9:00 p.m., but Marcus can take a couple of hours to go to sleep because he will not stay in one spot and does not want to go to bed. Tr. 121. The only nights Michael has to deal with bedtimes is Friday and Saturday, so there is no school the next morning. Tr. 121. Michael also denied not giving the children their medication. Tr. 121-22. When Nicole took Marcus to Toledo, Michael testified that Nicole told him she was taking him to Toledo for his behavior. Tr. 122. Michael testified that he offered to watch Jonathan, but Nicole said no because she thought Jonathan could be Marcus' playmate while he was in the hospital. Tr. 122. Michael agreed to participate in counseling and to attempt to work with Nicole concerning the children. Tr. 123. Michael also agreed to bathe the children on his weekdays, but would like to have Nicole send clothing for the children so that he could have them ready for bed. Tr. 124. Michael also testified

that he would like to have more access to the school information because he has not been getting any information from the school even after he asked for it. Tr. 124. Michael would also like to be the secondary contact to come get the children if there is an issue rather than having them go to their grandmother. Tr. 125.

{¶12} On cross-examination, Michael admitted that he did not believe in having as structured a household as Nicole has. Tr. 129. He testified that he is "not overly anxious to send them to bed at 7:30". Tr. 129. He also admitted that he does not believe in God and that he does not have an hour by hour schedule. Tr. 129.

> **We have breakfast in the morning. In the afternoon we have lunch, and in the evening we have supper and occasionally they have a snack.**
>
> **\* \* \***
>
> **There's not a set 6 o'clock [suppertime], no.**
>
> **Q. Exactly. You don't have any particular times for those things?**
>
> **A. Between five and six.**
>
> **Q. Right. And you don't have any particular times for breakfast. Just whenever you get up or get around to it?**
>
> **A. When they're up and around, yes, they get breakfast, yes, when they're hungry.**
>
> **Q. Okay.**

**A.   Do I have a set, exact minute?  No.  I don't know anybody who does.**

Tr. 129-30.

{¶13} When Myers questioned Michael, he admitted that he could have called the counselors and the school more often for information.  Tr. 132.  Michael also admitted that he could have contacted Nicole about Marcus when he was in Toledo.  Tr. 133.  He testified that he did not do so because if Nicole had information, she would call him.  Tr. 133.  Michael admitted that he and Nicole had a problem communicating and that he has frequently just given up.  Tr. 132-34.

{¶14} Michael's next witness was Mary Beth Siefring ("Siefring"). Siefring is a friend of Michael's who had lived with him at his apartment.  Tr. 135. Siefring testified that she had observed Michael with all five of his children at once and also with just Marcus and Jonathan.  Tr. 136.  Siefring testified that Michael has good interaction with Marcus and Jonathan.  Tr. 137.  Living in the house, Siefring has noticed that Marcus does not listen very well.  Tr. 138.  When Michael has disciplined Marcus, he has gotten "spanked on the backside" or placed into timeout.  Tr. 138.  Overall, the incidents where Marcus needs disciplined do not happen very often.  Tr. 139.  Siefring also testified that sometimes Marcus will come into her room and want to sleep in her bed.  Tr. 139. Siefring will let him lie there watching television until he falls asleep, and then she

turns it off. Tr. 139. On cross-examination, Siefring admitted that sometimes she thought "the spanking's a little hard." Tr. 138. However, she said the incidents did not cause her concern and they did not happen a lot. Tr. 138-39.

{¶15} Myers was the last person to testify. He recommended that visitations be changed from two days during the week to one and that it end at 6:00 p.m. so that Marcus has time to calm down before bed. Tr. 142. Myers also indicated that he would like to see Michael add a fence to his new home due to it being a rural home near a busy road. Tr. 145. As to the counseling, Myers indicated he would like the court to order Michael to participate. Tr. 147. Myers did indicate that all five of the children seem to interact well together. Tr. 149. When questioned, Marcus and Jonathan indicated that they enjoy spending time with their older siblings. Tr. 149.

{¶16} The magistrate entered her decision on May 22, 2012. Doc. 194. The decision recommended reducing Michael's parenting time from two evenings a week and every other weekend to alternating Saturdays between 9:00 a.m. and 6:00 p.m. and ordering Michael to pay all guardian ad litem fees. *Id*. Michael filed his objections to the magistrate's decision on August 3, 2012. Doc. 202. Michael objected to the following findings: 1) The GAL recommended Michael only have one day of visitation per week; 2) Michael claimed that people in counseling are killers; 3) Marcus was "mutilating" himself; 4)

Mischaracterizations of the testimony of Self; and 5) Mischaracterizations of the testimony regarding Michael's involvement with school and counseling. Michael also objected to the magistrate's application of R.C. 3109.051(D), the decision to reduce his visitation to a mere nine hours every other weekend, and ordering Michael to pay all of the GAL fees. *Id.* On August 31, 2012, the trial court entered its judgment entry sustaining some of the objections and overruling others. Doc. 204. The trial court modified the magistrate's decision and ordered counsel to prepare a judgment entry. *Id.* The final judgment entry, bearing the signature of the magistrate as well as the judge, was filed on January 30, 2013. Doc. 217. Michael filed his notice of appeal from this judgment on February 8, 2013. Doc. 220. He raises the following assignments of error.

### First Assignment of Error

**The trial court abused its discretion when it unreasonably, arbitrarily and unconscionably disregarded its August 31, 2012 entry by issuing its January 30, 2013 entry.**

### Second Assignment of Error

**The trial court erred when it significantly reduced [Michael's] visitation without a finding that [Michael] was unfit or that visitation with the minor children would cause harm.**

### Third Assignment of Error

**The trial court erred by failing to consider the necessary criteria for modifying a prior visitation order.**

**Fourth Assignment of Error**

**The trial court applied the wrong standard of review in considering the objections to the Magistrate's Decision**

**Fifth Assignment of Error**

**The trial court abused its discretion when it made [Michael's] visitation with his children contingent on him erecting a fence.**

{¶17} In the first assignment of error, Michael claims that the trial court erred by entering a judgment on January 30, 2013, that was inconsistent with its ruling on August 31, 2012. Michael made several objections to the magistrate's decision and the trial court sustained two of the objections to the factual findings. In addition, the trial court ruled that since the magistrate based her application of the law upon erroneous findings of fact, the application of the law must be modified. The trial court also ordered that the guardian ad litem fees would be split equally between Michael and Nicole. The trial court then amended the decision of the magistrate to read as follows.

> **Having found good cause for sustaining defendant's objection 1 to the magistrate's findings of fact, the court hereby amends paragraph 74 of the findings of fact portion of the magistrate's decision to read as follows:**
>
> **74. The guardian ad litem recommends that Michael have parenting time one weekday per week beginning at noon and continuing until 6:00 p.m., with him feeding the children. When Marcus is in school full time, father would have Marcus after school until 6:00 p.m.; mother would continue to have the children to take to church on father's weekend as she has done in the past; * * *. He further indicates that an order is necessary**

**for counseling. There also needs to be an order with regard to basic hygiene issues in the house. In addition to ordering Michael to attend counseling with the children, he should also attend parenting classes. Michael has attended counseling with the Veterans Affairs, however, it is unknown if the counseling has addressed parenting issues or issues related to his post-traumatic stress syndrome.**

**Furthermore, the court hereby modifies the Magistrate's Decision, such that paragraph 4 of the decision portion of the Magistrate's Decision is modified to read as follows:**

**4. Effective immediately, Michael's parenting time shall be modified. He shall have one weekday per week beginning at noon and continuing until 6:00 p.m., with him feeding the children. When Marcus is in school full time, father would have Marcus after school until 6:00 p.m.; mother would continue to have the children to take to church on father's weekend as she has done in the past; * * *.**

**In addition, paragraph 6 of the Magistrate's Decision is hereby modified to read as follows:**

**6. Nicole and Michael shall each pay and save each other harmless from one-half of the guardian ad litem fees incurred by [Myers] upon the court's approval of said fees.**

Aug. 31, 2012, Judgment, 8-9.

{¶18} Although this was the order of trial court, the judgment entry

ultimately signed by the trial court did not reflect this order, stating:

**It is further ORDERED, ADJUDGED, and DECREED that effective immediately Defendant's parenting time shall be modified. He shall have parenting time on alternating Saturdays from 9:00 a.m. until 6:00 p.m. Michael shall feed the children. Defendant may have the children on the weekend consistent with his parenting time with his three children from a prior marriage. There shall be no overnight visits. Plaintiff shall continue to**

-18-

**have the children to take to church on defendant's weekend as she has done in the past.[1]  Plaintiff shall have every Easter holiday and defendant shall have every Fourth of July holiday. During Christmas break, Defendant shall have the children every Christmas Eve at 10:00 a.m. until Christmas Day at 10:00 a.m. and plaintiff shall have Christmas Day at 10:00 a.m. until December 26th at 10:00 a.m.[2]  The receiving party shall transport the children.**

**\* \* \***

**It is further ORDERED, ADJUDGED, and DECREED that the guardian ad litem has had the opportunity to inspect the defendant's home.  The guardian ad litem has advised the court as to the hygiene, cleanliness, and suitability of the home.  It was ordered that defendant have a fence installed as previously recommended.  Defendant's parenting time is conditioned upon completion of the improvement.**

Jan. 30, 2013, Judgment, 2.  It is not clear why this judgment entry was signed as it clearly contradicts the prior order and is inconsistent by its own terms. Additionally, the terms of this order contradict the recommendation of the GAL. The GAL in its initial report recommended that Michael have the children on the same weekend as his older children once he moved to his new home.  Myers also indicated that he recommended the parties keep their old agreement as to the weekends, but reduce the weekday visits from two days to one and have it end at 6:00 p.m. so that Marcus can have time to relax at home before bed during the

---

[1] This court notes that this appears to be completely inconsistent with the prior part of the order limiting Michael's visitation to Saturday only and prohibiting overnight visits.  Why would Nicole need an order allowing her to take the children to church on Michael's weekend if he does not have them on Sunday mornings?

[2] Again, the order stating that Michael has the children from 10:00 a.m. until the next day at 10:00 a.m. contradicts the portion of the order stating that there shall be no overnight visits.

school week.  Exhibit GAL #1 and Tr. 142.  In his supplemental report submitted on July 31, 2012, the GAL indicated that Michael's home was appropriate for all visits with the children.[3]  "[W]hile the weight to be given to a guardian ad litem report is always within the prerogative of the trial court, when the trial court renders a decision which goes against the specific recommendation of the guardian ad litem, the trial court must at least address the reasons for doing so." *In re D.H.*, 3d Dist. Marion No. 9-06-57, 2007-Ohio-1762, ¶22.  The record in this case is insufficient for this court to determine why the final entry does not comply with prior rulings.  Therefore, the matter needs to be remanded to the trial court for further review.  Additionally, given the lengthy time between the original hearing and the time of this ruling, the trial court may wish to consider taking additional evidence to see what the situation with the parties currently is rather than relying on evidence more than a year old, especially considering that there were numerous conditions placed in the prior order.  The first assignment of error is sustained.

{¶19} In the second assignment of error, Michael claims that the trial court erred in significantly reducing his visitation without a finding that he was unfit or that it would cause harm to the children.  Michael claims that reducing his visitation from two days during the week and every other weekend to one day every other weekend is substantially interfering with his rights to parent his child.

---

[3] Although the 2nd GAL report was not filed with the clerk of courts, it was received by the trial court, reviewed by the trial court and the court acknowledged it in its January 30, 2013 Entry when it indicated that the GAL had conducted a home review.

> **A noncustodial parent's right of visitation with his children is a natural right and should be denied only under extraordinary circumstances, such as unfitness of the noncustodial parent or a showing that visitation with the noncustodial parent would cause harm to the children. The burden of proof in this regard is on the party contesting visitation privileges.**

*Pettry v. Pettry*, 20 Ohio App.3d 350, at syllabus, 486 N.E.2d 213, (8th Dist. 1984).

> **Because of the importance of the parent-child relationship and the likely benefits to the child as it grows up from reasonable (and, where necessary, supervised or restricted) visits with the parent who does not have custody, the courts should not deprive such a parent of all visitation privileges absent a clear showing that any contact with such parent would be detrimental to the child. It would follow that any diminution of visitation privileges * * * should be no greater than necessary to serve the best interests of the child. Where it is possible to serve such interests by an order providing for less than full deprivation of visitation privileges, the court should make such an order and no more. *Devine, supra,* 213 Cal.App.2d at 553, 29 Cal.Rptr. 132.**

*Id*. at 352.

{¶20} This court notes initially that this is not a case where visitations are limited due to a finding of dependency, neglect or abuse. Rather, this is a request for modification of visitation of two parents who are both fit. The request to have Michael's visitation reduced was made by Nicole and as such she bore the burden of proof on the matter. A review of the record in this case indicates that there was no evidence to support a finding that the visits with Michael were detrimental to Marcus and Jonathan to such an extent to restrict his visits so dramatically. In fact, contrary to the findings of the magistrate, neither Donovan nor Self testified

that it was the time with Michael that was the problem. They both testified it was not the visitation schedule, but was rather the difference between the two households resulting in a lack of consistency that was causing the acting out. Tr. 26-27, 44. The GAL indicated in his report that both Michael AND Nicole are at fault for the issues. Michael was not as involved as he would like and Nicole had not cooperated with the counselors as requested. See GAL Exhibit 1. Although Nicole alleged that she thought the children were in danger at Michael's home, there was no evidence to support that. The only claims she could make were the injuries to Jonathan and the allegation that Michael was too harsh on his discipline. Nicole admitted that those injuries were investigated by the police, but no charges were filed. Michael testified that the injuries were deemed to be accidental by both the police and children's services. It is clear that the magistrate, in reaching her decision has picked isolated bits of testimony, taken them out of context and based her findings on those determinations. For example, there was no evidence presented that Michael lacked parenting skills merely because he allowed his 17 year old daughter to die his hair bright red. While it may not be a decision that many people would make, it does not in and of itself indicate poor parenting. In addition, the finding of fact that Michael is a poor father because he takes the children for activities, such as Chuck-E-Cheese, and allows them to stay up past their bedtimes, is merely an opinion. Many parents

who only get to spend time with their children for limited periods of time every other weekend spend more time doing fun things than the residential parent will be able to do. Unfortunately, it is a natural consequence of divorce that the residential parent will more likely be the regular disciplinarian. This does not mean that the visits are detrimental to the children. Without any evidence to support her contentions that the visits are harmful to the children, Nicole has not carried her burden of proof for reducing Michael's visitation. The second assignment of error is sustained.

{¶21} Michael claims in the third assignment of error that the trial court did not properly consider the applicable factors when reaching its decision. The modification of visitation is controlled by R.C. 3109.051(D). When establishing a visitation schedule, the trial court must consider the sixteen statutory factors. R.C. 3109.051(D). Although it is preferable for the trial court to mention R.C. 3109.051 and that it applied the applicable factors, it is not mandatory that the trial court do so. *Cavagnaro v. Cavagnaro*, 12th Dist. Warren No. CA2012-02-012, 2012-Ohio-4024. "However, the trial court's findings and/or the record should indicate that the court considered the statutes and its factors when it rendered its decision." *Id.* at ¶9.

{¶22} Here, while the magistrate indicated that R.C. 3109.051 is the applicable statute, there is no indication in the record that the factors were applied

or to the reasoning of the trial court in its ruling. In its judgment ruling on the objections to the magistrate's decision, the trial court agreed that there were errors in the findings of fact and that these errors affected the application of the law and must be modified. However, the trial court gives this court no basis for determining whether the trial court considered the statutory factors, especially since the final judgment differs substantially from the prior order ruling on the objections to the magistrate's decision.

> **In reviewing a trial court's opinion, we must be able to ascertain the information and reasoning the court utilized in determining parenting time matters. When that analysis and clear reasoning is absent from the trial court's written opinion, it is impossible to review the decision without substituting the trial court's judgment with our own. As doing so is not permitted in an abuse of discretion review, we are forced to ask the trial court to clearly enumerate its reasoning and to follow statutory precepts before we can review its decision to modify the parenting time schedule.**

*Cavagnaro, supra* at ¶12. Thus, the third assignment of error is sustained.

{¶23} The fourth assignment of error challenges the standard of review used by the trial court when reviewing the magistrate's decision.

> **If one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections. In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law. Before so ruling, the court may hear additional evidence but may refuse to do so unless the objecting party demonstrates that the party could not, with reasonable diligence,**

-24-

> **have produced that evidence for consideration by the magistrate.**
> (Emphasis added.)

Civ.R. 53(D)(4)(d). Thus, the trial court must conduct an independent review of the evidence when reviewing a magistrate's decision. *Mackenbach v. Mackenbach*, 3d Dist. Hardin No. 6-11-03, 2012-Ohio-311. A failure to conduct an independent review is an abuse of discretion which may be reversed upon appeal. *Id.* at ¶9; *Figel v. Figel*, 3d Dist. Mercer No. 10-08-14, 2009-Ohio-1659. "After completing its [independent] review the trial court may adopt, reject, or modify the magistrate's decision." *Mackenbach, supra* at ¶9 (quoting *Teawalt v. Peacock*, 3d Dist. Shelby No. 17-10-18, 2011-Ohio-1726. Even if the judgment entry states that an independent review was conducted, if the record indicates otherwise, the opinion may be reversed. *Mackenbach, supra* at ¶13.

{¶24} In this case, Michael claims that the trial court failed to conduct an independent review. The law is set forth above. However, having previously found error which will require a remand for further proceedings, this assignment of error is now moot and need not be addressed further. App.R. 12(A)(1)(c).

{¶25} In his fifth and final assignment of error, Michael claims that the trial court erred by making his visitation contingent upon his erecting a fence. As discussed above, the finding of the trial court is being remanded for further review. Thus, this matter may not be final. The assignment of error is currently moot and will not be addressed further at this time. App.R. 12(A)(1)(c).

{¶26} Having found error prejudicial to Appellant, the judgment of the Court of Common Pleas of Mercer County, Domestic Relations Division, is reversed and the matter is remanded for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**PRESTON, P.J. and ROGERS, J., concur.**

**/jlr**